UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cr-129-TRM-SKL |
| | ) | |
| JASON JOHNSON | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## **REPORT & RECOMMENDATION**

Before the Court is a motion to suppress filed by Defendant Jason Johnson ("Defendant") [Doc. 122]. Defendant's motion seeks to suppress all evidence obtained as a result of his stop and arrest. Plaintiff United States of America ("Government") filed a response in opposition to the motion [Doc. 136] and Defendant filed a reply [Doc. 140]. The motion to suppress was referred for a report and recommendation by standing order pursuant to 28 U.S.C. § 636(b). An evidentiary hearing on the motion was held on July 9, 2020. This matter is now ripe.

For the reason addressed below, I **FIND** no constitutional violation occurred with respect to all claims raised in Defendant's motion to suppress and I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

## I.    FACTUAL BACKGROUND

On March 8, 2019, law enforcement officers from the Chattanooga Police Department ("CPD"), the Tennessee Highway Patrol ("THP"), the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), the East Ridge Police Department ("ERPD"), and the Drug Enforcement

Administration ("DEA") were involved in an operation to surveil, and possibly conduct a traffic stop of, Defendant because he was a suspect in a large scale drug trafficking organization. The pending motion seeks to suppress all evidence seized as a result of the traffic stop, that is the methamphetamine on Defendant's person and the incriminating statements made by Defendant.

At the evidentiary hearing, the Government called CPD Investigator Hunter Morgan ("Morgan") and THP Trooper Khalat Ghazi ("Ghazi") as witnesses. Both are veteran law enforcement officers who testified about their extensive law enforcement experience, which was not called into doubt during the hearing. Defendant called no witnesses. The collective evidence credibly establishes the following.

Around noon on March 8, 2019, ATF Special Agent Adam Baldwin ("Baldwin") made contact with Morgan to request assistance with surveillance and a possible traffic stop of Defendant. During the call, Baldwin told Morgan he was requesting help with the surveillance and possible traffic stop of a suspect "known for narcotics and possible guns." Morgan, who was not scheduled for duty until 2:00 p.m. that day, agreed to assist. Morgan then enlisted the help of various law enforcement agencies, including THP and ERPD, in the operation.

Prior to 2:00 p.m., Morgan met with Baldwin and ATF for about 30 to 40 minutes and they discussed Defendant's criminal history including their consideration of a printout of Defendant's reported criminal activity in Tennessee from the Tennessee Offender Management Information System ("TOMIS"), a database utilized by the Tennessee Department of Correction (Exhibit 5 is an exemplar of the current TOMIS report for Defendant). They also reviewed a report from the National Crime Information Center ("NCIC"), which indicated Defendant had a robbery charge in

the past and an outstanding Florida state warrant (later determined to be non-extraditable).[1]

While Morgan essentially admitted the information in either the NCIC or TOMIS reports might be flawed or contain expunged convictions, these reports still indicated to Morgan that Defendant had been charged with or convicted of various drug crimes as well as violent crimes such as robbery and reckless endangerment with a deadly weapon. Morgan also admitted a "deadly weapon" is not necessarily a gun or knife, and that he did not know the type of deadly weapon used in relation to the TOMIS report. He did know the TOMIS entries for "EVADING ARREST (FLIGHT)" and "RECKLESS ENDANGERMENT—DEADLY WEAPON INVOLVED" were color-coded by TOMIS as being "violent offenses" and Morgan thought the TOMIS report meant Defendant was "willing to get away at whatever costs" and had the potential to be violent. The NCIC report of a robbery indicated violent or dangerous behavior by Defendant to Morgan as well.

Baldwin and Morgan also discussed ATF's investigation, and Baldwin indicated that ATF had developed information that Defendant and/or the drug organization he worked for had access to guns. Considered as a whole, Morgan's testimony was ambiguous about whether Baldwin had informed him that *Defendant* had access to guns or that the *criminal organization* that Defendant was suspected of being a drug runner in had access to guns. His testimony was clear, however, that either way, if the organization had access to guns, it meant Defendant also had access. Morgan's overall testimony was that he understood Defendant or his organization might have

---

[1] As reflected in Exhibit 6 or otherwise undisputed, Defendant was issued a Florida Uniform Traffic Citation on April 21, 2014, for a first offense of driving with a suspended or revoked license (a second-degree misdemeanor). A warrant was issued on May 14, 2014 when Defendant allegedly failed to appear for arraignment on the citation. The warrant is directed to "the Sheriffs of the State of Florida" and specifies that it expires automatically five years after issuance, April 21, 2019. The Florida court recalled and quashed the warrant and dismissed the citation on March 18, 2019, ten days after the stop at issue.

access to guns—not that Baldwin reported Defendant was known to be armed with a gun.   Based on his training and experience, Morgan also knew that drug dealers were often armed with guns.

Morgan and Baldwin also discussed Defendant's past and suspected current involvement in drug trafficking, including the drug organization under investigation that day.   Based on his training and experience, Morgan thought that because ATF was involved, Defendant was a suspect in large-scale, not minor league, drug trafficking.

Moreover, they discussed location information developed from a federal warrant for cell phone GPS location data on Defendant's phone that indicated Defendant was in Atlanta that day. Baldwin described to Morgan that Defendant was under observation and the cell phone location data was being monitored.   Morgan testified Atlanta is a hub of drug cartel activity based on his training and experience, admitting there are several non-drug-trafficking reasons why Defendant might have been in Atlanta.

Baldwin reported Defendant was expected to return from Atlanta that afternoon.   They discussed making a safe traffic stop of Defendant if possible.   The existence of the Florida warrant was not discussed as a basis for the stop.

After the meeting with Baldwin, Morgan and the others officers involved positioned themselves to be able to surveil Defendant upon his return from Atlanta.   Morgan subsequently received information from ATF that Defendant had returned and was at an address on Connell Street, which is located in the City of East Ridge.[2]   Morgan, together with other law enforcement officers, was positioned to make possible contact with the Defendant if and when he left the Connell Street residence.   Defendant only stayed at the Connell Street residence for about 10 to

---

[2] It seems to be undisputed that the City of East Ridge is a separate incorporated city that maintains its own police department.

15 minutes, which Morgan thought was consistent with drug dealing, although he admitted there are also several innocent reasons why Defendant might have engaged in a short stop at the residence.

At about 5:45 p.m., just after Defendant left the Connell Street house, Morgan and, at least, Ghazi pulled behind Defendant in their separate police vehicles. Both officers thought Defendant was committing a traffic offense because he was driving in the rain with his windshield wipers activated, but without his headlights illuminated. The dash cam video shows it was raining, the police vehicles had their wipers activated, and the Defendant's car's lights were not on [Exhibit 3].

As a result of the observed traffic violation, Morgan turned on his blue lights to initiate a stop of Defendant's car. Ghazi did the same just moments later. Defendant pulled to a stop in a movie theater parking lot. It is undisputed that the Chattanooga/City of East Ridge border bisects the parking lot where Defendant pulled to a stop. Defendant was stopped from 20 to 50 yards from the Chattanooga side of the lot.

Both Morgan and Ghazi pulled behind Defendant with their blue lights activated. Morgan's police car stopped behind Defendant's vehicle. Ghazi stopped his THP vehicle behind Morgan's car. Almost simultaneously, additional police cars with officers involved in the coordinated investigation pulled up with their blue lights activated [Exhibit 3].

Both Morgan and Ghazi approached Defendant's stopped vehicle—Morgan on the driver's side and Ghazi on the passenger side. Morgan reached Defendant's car perhaps a few seconds before Ghazi, although on the video it appears to be almost simultaneously. Morgan made a direct approach to the driver's door without his gun drawn because he could see Defendant's hands on the steering wheel. Morgan told Defendant he was stopped for "warrants"

5

as a strategic or tactical decision so Defendant would not suspect he was under surveillance for his drug trafficking.

   As soon as he reached Defendant's stopped vehicle, Morgan immediately opened the front door of the vehicle and ordered Defendant to unbuckle his safety belt and step out of the car. Morgan did not see or smell drugs.   Morgan did not see a weapon.   During this interaction, when the Defendant asked what he had done, Morgan replied that he knew who the Defendant was and that he had "warrants."   When Defendant inquired about why he had warrants, Morgan stated that "we're about to find out here in just a second."

   When Defendant complied and exited the vehicle with his hands up, Morgan immediately instructed him to place his hands on the roof of the car.   Morgan then patted the outside of Defendant's clothes and almost immediately felt an object at the Defendant's waistband that, based on his training and experience, he suspected was a baggie of illegal narcotics.   When Morgan touched the bag during the frisk, Defendant dropped his head, which Morgan interpreted as Defendant knowing he was caught.   Morgan and Ghazi detained Defendant, and when Defendant was placed into handcuffs, a bag of suspected methamphetamine fell out of Defendant's waistband.

   Immediately after the patdown, Morgan told Ghazi, "I didn't feel a gun—just dope." Morgan turned Defendant over to Ghazi with a suggestion that Ghazi perform a more extensive search because Morgan knew he felt drugs and he believed (and said to Ghazi) that where there are drugs, there are guns.   Morgan thought a firearm might be located in a more extensive search based on the above noted information and his training and experience with drug dealers.

   In the end, it is undisputed that Defendant did not have any weapons in his possession, and Defendant was at all times compliant with Morgan's commands during the stop.   Ghazi testified he would have handled the situation in the same way Morgan did—i.e., conduct the stop based on

6

the traffic violation with an immediate patdown—if he had been the lead vehicle and on the driver's side of the stopped car.

At the time of the stop and frisk, Morgan thought he was in Chattanooga—not the City of East Ridge. Shortly after the frisk, an ERPD officer who had joined the group explained to Morgan that they were stopped in the City of East Ridge side of the parking lot.

Also, at the time of the stop and frisk, Morgan had not "looked into" the Florida warrant because there had been no time to do so. As a result, he did not know the Florida warrant was nonextraditable. Morgan never planned to, and did not, stop Defendant based on the Florida warrant. Instead, he planned to conduct a traffic stop if he observed a traffic violation.

In his written report, Morgan stated Defendant's traffic violation was the basis for the stop and that he immediately removed Defendant from the vehicle because of Defendant's "extreme history of violence and information regarding narcotics and a warrant." [Exhibit 1]. It is undisputed that Morgan did not advise the Defendant about his traffic violation during the time period relevant for purposes of the current motion.

Although neither testifying witness was involved in interrogating Defendant, it appears to be undisputed for purposes of the pending motion that Defendant was advised of his Miranda rights, waived his rights, and made incriminating statements to federal agents. Eventually, Defendant was released and given a traffic citation. Approximately two months later, Defendant was again arrested, this time in a home containing distribution amounts of suspected heroin and methamphetamine.

Defendant is charged in a multi-count, multi-defendant drug conspiracy indictment, which includes a charge related to the March 8, 2019 stop [Doc. 1]. Count One of the indictment charges Defendant and others with conspiring to distribute 500 grams or more of a mixture and substance

containing methamphetamine between December, 2018 and June, 2019, Count Two of the indictment charges Defendant, along with a co-defendant, with conspiring to possess with intent to distribute a mixture and substance containing a detectable amount of heroin in May 2019, and Count Three charges the Defendant with possessing 50 grams or more of methamphetamine on March 8, 2019 with the intent to distribute it.

During the hearing, the Government offered, without objection, the following exhibits: ATF's Report of Investigation prepared by Baldwin, CPD's Report of Investigation prepared by Ghazi, and ERPD's Field Offense Report prepared by Officer Kimsey (collective Exhibit 1), maps showing the Chattanooga/City of East Ridge Line in relation to the traffic stop and the Connell Street location (collective Exhibit 2), a recording from an officer's body camera (Exhibit 3), an obscured recording from Morgan's body camera (Exhibit 4), and an exemplar TOMIS report of Defendant's alleged criminal history (Exhibit 5). Defendant offered the following additional collective exhibit, without objection: the Florida warrant and documents pertaining to its post-stop recall (Exhibit 6).

## II.    STANDARDS

The Fourth Amendment guards against unreasonable seizures and searches.    U.S. Const. amend. IV.    "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809-10 (1996) (citations omitted). "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810 (citations omitted).    In short, seizure is constitutional if the officer has "either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (citation omitted); *see also United States v. Guajardo*, 388 F. App'x 483, 487 (6th Cir. 2010) ("[W]hen the stop is

for an *ongoing* violation—no matter how minor—reasonable suspicion will be sufficient to justify an investigatory stop." (citation omitted) (emphasis in original)).   This is the case regardless of "the actual motivations of the individual officers involved."   *Whren*, 517 U.S. at 813.[3]

Defendant, as the proponent of the motion to suppress, generally bears the burden of establishing that his Fourth Amendment rights were violated by a challenged search or seizure. *See Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) (citations omitted).   It is the Government's burden, however, to demonstrate by a preponderance of the evidence that a particular search or seizure is constitutional.   *See United States v. Baldwin*, 114 F. App'x 675, 681 (6th Cir. 2004) (citing *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990)).

Generally, if a seizure is not conducted in compliance with the Fourth Amendment, all evidence obtained as a result of the seizure must be suppressed.   *See United States v. Gross*, 550 F.3d 578, 583 (6th Cir. 2008) ("[E]vidence and statements obtained from [an] illegality must be excluded as 'fruit of the poisonous tree.'" (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).   This remedy of exclusion is a "judicial innovation," *United States v. Clariot*, 655 F.3d 550, 553 (6th Cir. 2011), to be used as a "last resort, not [a] first impulse."   *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

## III.   ANALYSIS

Defendant's motion seeks suppression of all evidence seized or arising from the March 8, 2019, stop of his vehicle.   First, he argues the initial stop was unlawful for a variety of reasons—

---

[3] The Sixth Circuit has "asserted, albeit in *dicta*, that reasonable suspicion of a completed misdemeanor is not sufficient to justify an investigatory stop."   *United States v. Collazo*, 818 F.3d 247, 254 (6th Cir. 2016) (quotation marks omitted) (quoting *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008)).   More recently, however, the Sixth Circuit rejected this per se rule, holding instead that reasonable suspicion of a completed misdemeanor may in some circumstances justify an investigatory stop.   *See United States v. Jones*, 953 F.3d 433, 437 (6th Cir. 2020).   In this case, the Government argues only the probable cause standard for the stop.

9

mainly because Morgan made the stop in the City of East Ridge, which is outside his geographical jurisdiction as a CPD officer. Second, Defendant contends that even if the initial stop was lawful, the frisk of his person was unlawful because Morgan lacked reasonable suspicion to conduct a patdown. Contrary to Defendant's arguments, I find no constitutional violation for the reasons set forth below.

### A. The Traffic Stop

Defendant does not admit that he committed the claimed traffic violation; he mainly argues that Morgan lacked geographical jurisdiction to make the stop and that Morgan had other motivations for the stop. I will address these arguments in turn.

#### 1. The Traffic Violation

In his motion, Defendant stated he "disputes Investigator Morgan's claim that he was operating his vehicle without required lighting." [Doc. 122 at Page ID # 537-38]. Although he offered no contrary evidence on the issue, because Defendant did not *concede* a traffic violation occurred, the basis for the stop will be addressed first. Accordingly, the Court must evaluate the proffered basis for the stop against the standard of whether it was objectively reasonable, given the totality of the circumstances.

In *Illinois v. Gates*, 462 U.S. 213, 244 (1983), the Supreme Court made clear that a determination of probable cause involves the exercise of a "practical, common-sense judgment." Significantly, the establishment of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* at 243 n.13; *see also United States v. Moncivais*, 401 F.3d 751, 756 (6th Cir. 2005) ("The establishment of probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." (internal quotation marks and citation omitted)). Describing the perspective

10

from which a reviewing court should evaluate a law enforcement officer's determination of probable cause when making a traffic stop, the United States Court of Appeals for the Sixth Circuit has held that "all probable cause determinations [are] fact-dependent and will turn on what the officer knew *at the time he made the stop*."   *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (emphasis in original).

This Court has previously found probable cause to initiate a traffic stop based on a similar violation of the Tennessee statute requiring operation of a vehicle's headlights during any time when rain, mist, or other precipitation necessitates the constant use of windshield wipers by motorists.   *United States v. Resa*, 552 F. Supp. 2d 720, 728 (E.D. Tenn. 2008) (citing Tenn. Code Ann. § 55-9-406(b)); *see also State v. Singer*, No. 2018-01936-CCA-R3-CD, 2019 WL 5095802, at *10 (Tenn. Crim. App. Oct. 11, 2019) (slip op.) ("The proof presented at the suppression hearing and trial showed that Officer Price observed Singer driving in the rain without his headlights activated. Because Officer Price observed Singer committing a traffic violation pursuant to Code section 55-9-406, he had reasonable suspicion to stop him.").   The same result is reached here.

I **FIND** the witnesses' testimony credibly and abundantly demonstrates probable cause for the traffic stop of Defendant because he did not have his vehicle's lights turned on even though it was raining hard enough to necessitate the constant use of wipers as required by state law.[4]   *See* Tenn. Code Ann. § 55-9-406(a) and (b)(1) (requiring the use of headlights during rain; specifically, when it is raining hard enough to "necessitate[] the constant use of windshield wipers by motorists.").

### 2.   Geographical Jurisdiction

---

[4] Accordingly, it is unnecessary to address the Government's suggestion that law enforcement had a reasonable suspicion separate from the traffic violation.

Having found probable cause for the stop, I will next address the validity of Defendant's

stop by Morgan, an officer with CPD, made in the City of East Ridge.   Although Morgan was

exercising police authority beyond his geographical jurisdiction under state law, I **FIND** his

participation in the stop of Defendant did not violate Defendant's constitutional rights.

As acknowledged by Defendant, the Sixth Circuit has recognized that "arrests within the

state of Tennessee made by officers outside of their geographical jurisdictions [are] valid under

the provisions of the state's citizen's arrest statute."   *United States v. Layne*, 6 F.3d 396, 398-99

(citing the Tennessee Supreme Court's decision in *State v. Johnson,* 661 S.W.2d 854 (Tenn.

1983)[5]).   The *Layne* court held the defendant's arrest by officers outside their jurisdiction "was

valid under the Tennessee private citizen's arrest statute," and "did not violate the Fourth

Amendment."   *Id.* at 399; *see also Sisk v. Shelby Cnty., Tenn.*, 110 F.3d 64, 1997 WL 157713, at

*3 (6th Cir. Apr. 1, 1997) (table) (A police officer acting beyond his or her authority may use the

citizen's arrest statute to validate an otherwise unlawful arrest for driving under the influence

because it is a public offense).   While "[o]ther jurisdictions have adopted a similar rationale in

applying their respective private citizen's arrest statutes," *Layne*, 6 F.3d at 399 (citation omitted),

there is a nonbinding contrary view, which finds that citizen's arrest statutes do not apply to on-

duty police officers.

In following *Layne*, this Court first determines whether Morgan's actions were authorized

by Tennessee law.   Under Tennessee Code Annotated § 40-7-109(a)(1), private citizens can make

---

[5] In *Johnson*, the defendant argued that his arrest and the subsequent search and seizure were
unconstitutional and that the arresting officer had acted without authority because he was acting
outside his geographical jurisdiction.   661 S.W.2d at 859.   The Tennessee Supreme Court upheld
the arrest by an officer from Sequatchie County, Tennessee, of a suspect in Bledsoe County after
the officer received information from an informant that the suspect was attempting to sell stolen
firearms in his possession in that county.   *Id.*

arrests if they witness another person commit a "public offense" in their presence. A violation of Tennessee Code Annotated § 55-9-406(a) or (b)(1), requiring the use of headlights, is a Class C misdemeanor and, therefore, a public offense. *See* Tenn. Code Ann. § 55-9-406(b)(4). While Defendant argues *Layne* is distinguishable because it involved a *felony*—not a misdemeanor traffic violation—Defendant also acknowledges that Tennessee state courts have interpreted "public offense" to include any misdemeanor offense. *See State v. Martinez*, 372 S.W.3d 598, 610-11 (Tenn. Crim. App. 2011). As a result, Morgan's actions were authorized by Tennessee's citizen's arrest law even though Defendant was not committing a felony. Applying *Layne*, I **CONCLUDE** that Defendant's constitutional rights were not violated even though Morgan was slightly outside the boundary of his geographical jurisdiction and Defendant was stopped on the basis of a traffic violation. *See Layne*, 6 F.3d at 399.

Moreover, as the parties acknowledge—albeit for different reasons—state law does not control this Court's Fourth Amendment analysis. *See Virginia v. Moore*, 553 U.S. 164, 172 (2008) ("While [local law enforcement] practices 'vary from place to place and from time to time,' Fourth Amendment protections are not 'so variable' and cannot 'be made to turn upon such trivialities.'" (quoting *Whren*, 517 U.S. at 815)); *Jones*, 953 F.3d at 438 (a state's "prerogative to experiment with greater constitutional protections does not require the Fourth Amendment to do the same." (citations omitted)); *United States v. King,* No. 1:09CR368, 2009 WL 10679741, at *7 n.2 (N.D. Ohio Nov. 4, 2009) (explaining that the extra-jurisdictional location of the stop was "not relevant to its constitutional validity" (citing *Whren*, 517 U.S. at 815)), *aff'd*, 466 F. App'x 484 (6th Cir. 2012); *Swanson v. Town of Mt. View*, 577 F.3d 1196, 1202 (10th Cir. 2009) ("[A]lthough Tenth Circuit law holds that compliance with state law may be relevant to the court's Fourth Amendment reasonableness analysis, we have never held it to be determinative of the

13

constitutionality of police conduct." (internal quotation marks and citation omitted)); *Byndon v. Pugh,* 350 F. Supp. 3d 495, 508 (N.D.W. Va. 2018) ("[W]ithout addressing whether Officer Pugh violated West Virginia law, such a violation does not necessarily mean the defendants violated the plaintiff's federal constitutional rights. . . . In short, relevant precedent does not establish that a traffic stop that was based on observing an alleged traffic infraction outside an officer's home jurisdiction, even if unauthorized by state law, constitutes an unlawful seizure under the Fourth Amendment."); *see also United States v. Parke*, 842 F. Supp. 281, 286-87 (E.D. Mich. 1994) ("In light of *Leon,* this Court will not exclude evidence from a search incident to a stop which a police officer quite reasonably believed to be within his authority to make.").[6]

Furthermore, even if Morgan's actions standing alone might have violated Defendant's rights (contrary to my recommendation), Morgan did not act alone. The investigation and surveillance of Defendant involved officers with the CPD, THP, ATF, DEA, and ERPD. At minimum, the THP, which undisputedly has statewide jurisdiction, participated in the traffic stop, and Ghazi was not outside his geographical boundary in doing so. True, Morgan was slightly beyond the jurisdiction of the CPD, he was the first officer by a few seconds to approach Defendant

---

[6] The Sixth Circuit very recently again recognized that when the "existence of probable cause under federal law deems the stop reasonable; 'state restrictions do not alter the Fourth Amendment's protections . . . .'" *United States v. Macklin*, No. 19-6462, 2020 WL 4049751, at * (6th Cir. July 20, 2020). In *Macklin*, the defendant argued his due-process rights had been violated when dash camera footage of his traffic stop was deleted, when the deletion itself was an alleged violation of local police policy. In addition to finding no constitutional violation due to the erased footage, the court further reasoned that, even if there had been a due-process violation, the motion to suppress should still be denied because the Sixth Circuit has never "found a due-process violation to trigger application of the exclusionary rule, a rule which 'bars the prosecution from introducing evidence obtained by way of a *Fourth Amendment* violation.'" *Id.* at *4 (quoting *Davis v. United States*, 564 U.S. 229, 232 (2011)) (emphasis in original). Accordingly, to the extent Defendant is arguing that Morgan's participation in Defendant's arrest is a due-process violation, the exclusionary rule would not apply. This is an alternative basis for denying Defendant's motion to suppress based on Morgan's participation (in addition to my finding that no constitutional violation occurred).

14

and he alone conducted the initial frisk of Defendant, but he worked in conjunction with Ghazi and others. I have been presented with no authority, and have found none, indicating the Fourth Amendment requires this Court to parse out in a joint investigation and operation which officer was the first to turn on his blue lights, was the first in line to park behind a suspect's car, or was the first to reach the car by a few seconds to minutes.

Finally, Tennessee state law (to the extent it is considered) allows an out-of-jurisdiction officer to perform some police functions when accompanied by an officer who is within her territorial jurisdiction. *See State v. Smith*, 868 S.W.2d 561, 572-73 (Tenn. 1993) (refusing to invalidate a warrant obtained and executed by an officer from a contiguous jurisdiction when he was accompanied for its execution by officers from the county where the property subject to the search warrant was executed (citations omitted)); *State v. Smith*, No. M2014-01172-CCA-R3-CD, 2015 WL 3550106, at *4 (Tenn. Crim. App. June 8, 2015) (holding that "[b]ecause the proof at trial showed that T.B.I. personnel accompanied the LaVergne Police Department to search the defendant's residence and because the defendant does not challenge the jurisdiction of the T.B.I., the presence of this agency cured any jurisdictional issues." (citing *State v. Powell*, 53 S.W.3d 258, 261-62 (Tenn. Crim. App. 2000))).

To be unlawful, a seizure must be unreasonable. I do not find Morgan's involvement in the stop (or frisk) under the mistaken belief that he was within his geographical jurisdiction resulted in an unreasonable seizure (or frisk) under the circumstances at hand.

### 3. Pretextual Stop

Finally, Defendant argues the traffic stop (and the outstanding warrant) are merely pretextual reasons for the stop. By all accounts, the officers were looking for any lawful reason to stop Defendant. Defendant unwittingly provided that reason by committing a traffic violation.

15

Therefore, whatever other subjective reasons law enforcement had for making the stop are legally irrelevant since the stop is supported by probable cause. *See, e.g., Whren*, 517 U.S. at 812-13 (holding that when an officer has probable cause for a traffic stop, the stop does not run afoul of the Fourth Amendment even if the officer is actually motivated to make the stop based on some other purpose, such as investigating a wholly unrelated crime); *United States v. Canipe*, 569 F.3d 597, 601 (6th Cir. 2009) (holding that because the officer "possessed probable cause to believe that a traffic violation occurred when he observed [defendant] not wearing a seatbelt, [officer's] motivation for making the stop (suspicion of unlawful possession of a firearm) did not undermine [the constitutionality of the stop]." (citing *Whren*, 517 U.S. at 813-19)); *see also United States v. Hughes*, 606 F.3d 311, 315-16 (6th Cir. 2010) (rejecting the district court's analysis as to why the officer "*really*" stopped the vehicle); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) (holding "an officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle." (citing *Whren*, 517 U.S. at 812-13)); *Ferguson*, 8 F.3d at 391 (holding that "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful" (citations omitted)).

Officers will often have unrelated suspicions about a traffic violator, but reviewing courts do not ask whether an officer would have made a traffic stop if not for those unrelated suspicions; they ask only whether "this particular officer in fact had probable cause to believe that a traffic offense had occurred." *Ferguson*, 8 F.3d at 391. If so, the stop is reasonable. *Id.* Accordingly, I **FIND** the Government has met its burden to establish probable cause for the stop and that the stop was constitutional. Defendant's arguments to the contrary do not warrant suppression.

**B. The Frisk**

During the frisk, Morgan felt an object at Defendant's waistband that Morgan immediately suspected was narcotics. When Defendant was handcuffed, a bag of (then suspected, now confirmed) methamphetamine fell out of Defendant's waistband. Defendant contends the frisk was unconstitutional because he had no weapons in his possession, he exhibited no action that Morgan could have reasonably interpreted as a safety threat, and he was compliant with Morgan's commands at all times. I respectfully disagree with Defendant's claims.

During a traffic stop for a routine violation of a traffic law, an officer can order that the occupant of the vehicle step out of their car. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) ("What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety."). It is likewise well established that law enforcement officers may lawfully pat a suspect's outer clothing (a "frisk" or "patdown") during a traffic stop if there is "reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009); *see also United States v. Strahan*, 984 F.2d 155, 158 (6th Cir. 1993) (a police officer may conduct a limited search for concealed weapons, if the officer believes that a suspect may be dangerous); *United States v. Johnson*, 246 F. App'x 982, 986 (6th Cir. 2007) (same). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law." *Adams v. Williams*, 407 U.S. 143, 146 (1972).

In determining whether there was reasonable suspicion warranting a patdown search, a court must consider the totality of the circumstances. *United States v. Noble*, 762 F.3d 509, 521 (6th Cir. 2014) (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Reasonable suspicion exists if a

reasonably prudent person under the circumstances would be warranted in believing that his or her safety or that of others was in danger. *Id.* at 521-22 (citing *Terry*, 392 U.S. at 27). There must be a particularized and objective basis for suspecting that the particular individual is armed and dangerous. *Id*. at 522. "Officers are entitled 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Lyons*, 687 F.3d at 763 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). ! ! !

In cases involving suspected drug trafficking, courts have held that "[t]he indisputable nexus between drugs and guns presumptively creates a reasonable suspicion of danger to the officer." *United States v. Ayers*, No. 1:11-CR-63, 2011 WL 5076342, at *7 (S.D. Ohio Oct. 25, 2011) (alteration in original) (quotation marks omitted) (quoting *United States v. Keith,* No. 08–CR–360, 2010 WL 58988, at *6 (N.D. Ohio Jan. 6, 2010)) (citing *United States v. Frazier,* 249 F. App'x 396, 403 (6th Cir. 2007) ("[D]rug dealers are often armed."); *United States v. Powell,* No. 99-5137, 2000 WL 357262, at *14 (6th Cir. Mar. 29, 2000) ("[This] frisk was constitutional because [the] suspect was wanted on narcotics charges and [the] officer could reasonably believe that suspect used a gun to protect his drugs.") (alterations in *Ayers*); *United States v. White,* No. 93-4049, 1995 WL 244069, at *10 (6th Cir. Apr. 26, 1995) ("[It is] common knowledge that individuals involved in buying and selling drugs often carry guns . . . .")); *cf. United States v. Chavis,* 296 F.3d 450, 458 (6th Cir. 2002) ("[D]rugs and guns are frequently connected . . . .")).

At the time of the frisk, Morgan knew ATF was engaged in an investigation that indicated Defendant was involved in large scale drug trafficking. Morgan knew this Court had authorized a search warrant for the disclosure of GPS information about the location of Defendant's phone, which was being monitored by ATF. Morgan had been told of, at least, Defendant's involvement

with a drug trafficking organization with access to guns. Morgan knew Defendant had returned from Atlanta, a place Morgan considered to be a drug trafficking hub, that day and had made a short stop at a house, which was consistent with drug trafficking based on Morgan's training and experience. Moreover, Morgan's training and experience was that drug dealers were commonly armed.

However, in this case Morgan did not rely solely on the nexus between drugs and guns to find a reasonable suspicion of danger to the officers—he knew even more. Morgan knew Defendant had a criminal history—he had reviewed reports that Defendant had convictions for drug dealing, evading arrest, reckless endangerment with a dangerous weapon, and a robbery charge. The totality of these circumstances rose to the level necessary to conduct a patdown search of Defendant—even if innocent or less dangerous explanations for Defendant's behavior and criminal history might exist—because a reasonably prudent person under the circumstances would be warranted in believing that his safety or that of others was in danger. *See Arvizu*, 534 U.S. at 277 (holding an officer "need not rule out the possibility of innocent conduct" in order to form a reasonable suspicion (citation omitted)); *Terry*, 392 U.S. at 22 (holding although each individual fact forming the basis of an officer's suspicion may be "perhaps innocent in itself," reasonable suspicion nevertheless exists when all the circumstances "taken together warranted further investigation").

Considering the totality of the circumstances, I **FIND** Morgan had a reasonable belief that Defendant was armed and dangerous and, therefore, the frisk was justified and constitutional.

Defendant does not directly contest anything post-frisk. For the sake of clarity, however, I note the following. While the purpose of a frisk is to search for weapons, if an officer feels something during the frisk whose contour or mass makes its identity immediately apparent, there

has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons. *Minnesota v. Dickerson*, 508 U.S. 366, 375-76 (1993). "[I]f the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." *Id*. Morgan frisked Defendant for weapons, and felt what he plainly recognized to be a bag of drugs. Moreover, Morgan did not immediately remove the suspected contraband from Defendant's waistband; instead, the suspected contraband fell out of Defendant's waistband when Defendant was handcuffed.

In summary, Morgan was well within constitutional bounds of a traffic stop when he opened the car door and ordered Defendant to step out, Morgan had reasonable suspicion supporting the frisk of Defendant under the totality of the circumstances, and Defendant was properly placed in handcuffs, which is when the narcotics fell to the ground. Accordingly, Defendant's motion to suppress should be denied.

As a result, it is not necessary to address the parties' arguments concerning the inevitable discovery doctrine or the good faith exception.[7]

---

[7] However, the good faith exception is briefly addressed, as an alternative recommendation, in footnote 6, above.

## IV.    CONCLUSION

For the reasons stated above, I **RECOMMEND**[8] that Defendant's motion to suppress [Doc. 122] be **DENIED** in its entirety.

**ENTER**:

s/*Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[8] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party.   Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure.   Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).   The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general.   *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).   Only specific objections are reserved for appellate review.   *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).